Electronically Filed - Clay - September 16, 2020 - 08:48 AM



IN THE CIRCUIT COURT OF CLAY COUNTY MISSOURI
AT LIBERTY, MISSOURI

| | | |
|---|---|---|
| BRADLEY J. FARMER, | ) | |
| Individually, as surviving spouse of Terry | ) | |
| J. Farmer, deceased, and in his capacity as | ) | |
| Personal Representative of the Estate of | ) | Case No. _____ |
| Terry J. Farmer, deceased, | ) | |
| | ) | Division _____ |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| BOARD OF POLICE COMMISSIONERS | ) | |
| OF KANSAS CITY, MISSOURI, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DON WAGNER, | ) | |
| in his official capacities as Member and President | ) | |
| of the Kansas City Board of Police Commissioners, | ) | |
| | ) | |
| MARK TOLBERT, | ) | |
| in his official capacities as Member and Vice- | ) | |
| President of the Kansas City Board of Police | ) | |
| Commissioners, | ) | |
| | ) | |
| CATHY DEAN, | ) | |
| in her official capacity as Member and Treasurer | ) | |
| of the Kansas City Board of Police Commissioners, | ) | |
| | ) | |
| NATHAN GARRETT, | ) | |
| in his official capacity as Member of the | ) | |
| Kansas City Board of Police Commissioners, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| QUINTON LUCAS, | ) | |
| in his official capacity as Member of the | ) | |
| Kansas City Board of Police Commissioners, | ) | |
| | ) | |
| Defendants. | ) | |

## PETITION FOR DAMAGES FOR WRONGFUL DEATH

Plaintiff, Bradley J. Farmer, individually and as Personal Representative of the Estate of Terry J. Farmer, deceased, by his attorneys, Mark E. Kelly and Kelly Law Office, P.C., states the following causes of action:

1.      Plaintiff Bradley J. Farmer (sometimes hereafter "Plaintiff," "Brad Farmer," or "Brad") is an individual resident of Kansas City, Clay County, Missouri, and is both the surviving spouse of Terry J. Farmer, deceased, and the Personal Representative of the Estate of Terry J. Farmer, deceased (sometimes hereafter "Terry Farmer" or "Terry").

2.      Defendant Board of Police Commissioners of Kansas City, Missouri is the public entity organized and existing pursuant to RSMo. Sections 84.350, et seq., and statutorily charged thereunder with the duty and responsibility to manage and control the Police Department and police force of the City of Kansas City, Missouri, including its employees and facilities. (Defendant Board of Police Commissioners of Kansas City, Missouri, and its five members identified below, are sometimes collectively hereafter "Defendant Board")

3.      Defendant Don Wagner is a Member, and the President, of the Board of Police Commissioners of Kansas City, Missouri. He is sued in his official capacity only.

4.      Defendant Mark Tolbert is a Member, and the Vice-President, of the Board of Police Commissioners of Kansas City, Missouri. He is sued in his official capacity only.

5.      Defendant Cathy Dean is a Member, and the Treasurer, of the Board of Police Commissioners of Kansas City, Missouri. She is sued in her official capacity only.

6.      Defendant Nathan Garrett is a Member of the Board of Police Commissioners of Kansas City, Missouri. He is sued in his official capacity only.

2

7.     Defendant Quinton Lucas is a Member of the Board of Police Commissioners of Kansas City, Missouri. He is sued in his official capacity only.

8.     This court is the proper venue for this action pursuant to RSMo. Section 508.010.4, because Plaintiff's decedent, Terry J. Farmer, suffered injury and died in Clay County, Missouri, due to Defendant Board's negligent acts and omissions here.

9.     This is a civil rights action brought against Defendants for wrongful death pursuant to Missouri's Wrongful Death Act and associated statutes, including but without limitation, RSMo. §§ 537.080 and 537.09042, and pursuant to  U.S.C. §§ 1983 and 1988 for committing acts, under color of law, in violation of Terry J. Farmer's rights secured under the Constitution and laws of the United States.

10.     While Terry Farmer was in the custody, care, and control of Defendant Board, its local police station, Chief of Police, police officers, administrators, jailors and dispatchers, Defendant Board denied Terry adequate and proper treatment for a known serious medical and/or psychiatric condition. Defendant Board failed to protect Terry from the same known risks of suicide and to have his serious medical needs addressed. In this regard, Defendant Board acted with deliberate indifference to the risks associated with Terry's known serious medical condition and risk of suicide, and Defendant Board's inaction amounted to a deliberate indifference to or tacit authorization of acts and practices that violated Terry's rights and negligently, recklessly, or intentionally put him at risk of harm.

11.     As a direct and proximate result of Defendant Board's disregard of accepted standards, Terry's rights, and his known and recognized condition, Terry Farmer not only experienced extensive pain and suffering, he died a horrible and preventable death. Defendant Board's acts and omissions, occasioned under color of state law, evince a knowing and

3

deliberately indifferent pattern of conduct in violation of both the Eighth and Fourteenth Amendments of the United States Constitution and state law, giving rise to both state law claims and federal claims.

PARTIES

12.     At all relevant times, Plaintiff, Bradley J. Farmer was the lawful spouse of Terry J. Farmer.

13.     Plaintiff was appointed Personal Representative of the Estate of Terry J. Farmer, deceased, by Order of the Probate Division of the Circuit Court of Clay County, Missouri, which granted Letters of Administration on February 6, 2020, in case number 20CY-PR00085.

14.     Plaintiff was at all relevant times a citizen of the state of Missouri, and as the surviving spouse and Personal Representative of Terry Farmer, is authorized to bring this suit pursuant to Missouri's Wrongful Death Act and associated statutes, including but without limitation, Mo. Rev. Stat. §§ 537.080 and 537.090, and under 42 U.S.C. §§ 1983 and 1988 for damages associated with the violations of his rights and liberties under the Constitution of the United States of America.

15.     At all relevant times, Defendant Board of Police Commissioners of Kansas City, Missouri owned, maintained, controlled, and held custody, rule, keeping, and charge of the Shoal Creek Police Station (sometimes hereafter "Shoal Creek"), located in Kansas City, Clay County, Missouri.

16.     The Shoal Creek Police Station has holding or jail cells, including one referenced in a relevant police report as Detention Cell 2.

17.     Defendant Board had the duty to implement and enforce jail policy, and the duty of properly supervising the Shoal Creek and hiring, training, directing and supervising its

4

employees, the police officers, administrators, jailors and/or dispatchers who ran and kept Shoal Creek.

18.     At all relevant times, Defendant Board employed the following individuals, and is responsible for their actions, including each of their wrongful, unconstitutional, negligent, reckless or intentional actions described below, all of which were carried out in the course and scope of their employment:

    a.     Richard C. Smith ("Chief Smith") was the Chief of Police of Kansas City, Missouri and acted under the color of the laws, statutes, ordinances, regulations of the State and Missouri and pursuant to the policies, customs and usages of the Board. At all relevant times, Chief Smith had custody, keeping and charge of the Shoal Creek Police Station, and of all detainees in the cells at that Station. Chief Smith was the commanding officer of the other Police employees named below, and, together with Defendant Board, had responsibility for the training, supervision, discipline and conduct of those individual Officers and Sergeants as more fully set forth herein. Chief Smith was a policymaker for the Shoal Creek, and was directly responsible for its implementation in whole or in part.

    b.     At all relevant times, Sergeants Wiedler and Coppinger, and Officers Gormont, Graham, Davis, Bax, Clemons and James, and others yet to be identified, were police officers, administrators, jailors and/or dispatchers employed by Defendant Board acting within the course and scope of that employment and under the direction and control of the Board and Chief Smith. At all relevant times, these individuals were acting under the color of the laws, statutes, ordinances, and regulations of the State of Missouri and pursuant to either official policy or the custom and practice of Defendant Board.

FACTUAL ALLEGATIONS

19.     At about 8:30 p.m. on December 27, 2019, Terry Farmer was involved in a minor

motor vehicle accident near the intersection of Northeast Hill St. and North Oak Trafficway,

where Terry, who was quite intoxicated, had attempted a left-hand turn from North Oak onto

Northeast Hill St., and had struck an oncoming car.

20.     Terry called his husband, Brad Farmer, immediately after the accident, and Brad

arrived at the scene before representatives of the Kansas City Police Department (sometimes

hereafter "KCPD") arrived.

21.     Shortly thereafter, KCPD Officer Graham and Officer Gormont placed Terry

under arrest.

22.     Brad Farmer spoke with Officer Graham and Officer Gormont at the scene. When

it was clear that Terry would be taken to and incarcerated at Shoal Creek, Brad asked Officer

Gormont to make sure that KCPD personnel keep an eye on Terry; he warned Officer Gormont

that Terry had mental and emotional conditions that might be exacerbated by the arrest, and that

Terry might present a danger to himself.

23.     Before taking Terry to Shoal Creek, Officer Gormont reassured Brad that Terry

would be safe in custody, and that "they can see in the cells with cameras."

24.     KCPD Sergeant Wiedler, Sergeant Coppinger, and Officers Davis, Bax, Clemons,

James, and perhaps others as yet unknown to Plaintiff, carried out or assisted in administrative

tasks necessary and incident to completion of Terry's arrest, booking, and detention at Shoal

Creek.

25.     In his Alcohol Influence Report regarding the arrest, Officer Davis reported

Terry's attitude as "MOOD SWING," and further recorded that in an interview beginning at

6

10:11 p.m., Terry reported "mental conditions," including "BIPOLAR, ANXIETY, MOOD DISORDER'S [sic]," and that Terry advised him that he that he was taking Xanax, which has known side effects including paranoid or suicidal ideation.

26.     After booking Terry in at Shoal Creek, Officer Davis had him transported to North Kansas City Hospital (NKCH) for medical evaluation because of his intoxication. NKCH ER staff checked his vitals, confirmed that he was intoxicated with alcohol, gave him water, and provided counseling regarding the expected hangover, the effects of alcohol on the human body, and possible life changes.

27.     ER staff at NKCH released Terry to return to Shoal Creek at 12:30 a.m. on December 28.

28.     Discharge information provided by NKCH staff included a written description of symptoms of moderate alcohol intoxication: "Erratic behavior…depression…Impaired judgment."

29.      Defendant Board's Police employees were aware that Terry suffered from mental conditions likely to be exacerbated by his intoxication and subsequent hangover, and that he was at risk of self-harm, and though they were, at NKCH, within roughly 300 yards of a psychiatric facility at which Terry could have been properly screened, Defendant Board's Police employees transported Terry back to Shoal Creek, where they put him in Detention Cell 2.

30.     Defendant Board's Police employees knew that there was a telephone on the wall in Detention Cell 2: a sturdy metal wall unit, with a metal cord.

31.      Sergeant Wiedler, Sergeant Coppinger, and Officers Davis, Bax, Clemons and James, having full knowledge that Terry suffered from a mental condition and was at risk of self-

harm, failed to perform the ministerial duty of properly screening Terry before placing him in Detention Cell 2.

32.     During Terry's incarceration, Terry presented serious medical needs that were known by Defendant Board's Police employees, in that he suffered from a diagnosed mental condition and/or was at risk of self-harm and suicide. Defendant Board's employees were aware that Terry was mentally ill, taking prescription medication, including Xanax for anxiety and depression, and knew or should have known that his intoxication would likely exacerbate his conditions.

33.     During his detention by Defendant Board's Police employees, Terry's medical, mental and emotional health deteriorated.

34.     Defendant Board's Police employees knew or should have known that the risk of Terry's serious self-harm and suicide was substantial, real, serious, and imminent.

35.     Despite the foregoing, Defendant Board's Police employees did not provide the medical and psychiatric treatment and therapy required by Terry, and failed to adequately monitor Terry's condition and behavior, place him on suicide watch, place him in a cell free of items likely to be used in a suicide, or otherwise act to have his serious medical needs addressed or to take measures to protect Terry from the known and substantial risk that he would harm himself.

36.     Detention Cell 2 at Shoal Creek is equipped with one or more video surveillance cameras which record and display on video monitors the actions of detainees while in their cells for the purpose of monitoring detainee safety.

37.     Detention Cell 2 at Shoal Creek also has a glass door through which Defendant Board's Police Department employees can view the actions of detainees while in their cells for the purpose of monitoring detainee safety.

38.     On the morning of December 28, 2019, one or more of Defendant Board's Police Department employees, as yet unknown to Plaintiff, was or were charged with the ministerial duty of monitoring detainees, including Terry, via video display screens and direct observation through cell door glass.

39.     Defendant Board and its Police Department employees were aware of the risk of self-harm and suicide to detainees, including Terry, housed in a cell with a metal telephone cord that could be used to create a ligature, and were further aware of the need for visual checks on detainees in their cells.

40.     Defendant Board and its Police Department employees were or should have been aware that many other detainees housed in cells with telephones had used telephone cords to create ligatures and commit or attempt suicide.

41.     On the morning of December 28, 2019, directly in front of the Detention Cell 2 door glass and in full view of a video surveillance camera, Terry Farmer wrapped the metal telephone cord around his neck to form a ligature, secured the ligature by hanging the receiver on the hook, and lowered himself until his full weight was hanging on the ligature.

42.     Defendant Board's records are inaccurate and contradictory as to the time at which Terry's suicide began, but the Detention Cell 2 video demonstrates that he hung on the telephone cord for more than eleven minutes and thirty seconds before Defendant Board's Police Department employees entered his cell.

9

43.     Although Terry's suicide attempt was displayed on the video monitors as it occurred, and although it was plainly visible through the glass door of Detention Cell 2, Defendant Board's Police Department employees willfully and recklessly failed to perform their ministerial duty to monitor Terry and/or took no timely action to alert others of Terry's behavior and obvious and imminent risk of serious physical harm or death, or to otherwise intervene to assist Terry.

44.     Thereafter, Defendant Board's Police Department employees entered Terry's jail cell, released him from the telephone cord, lowered him to the ground, and began to administer CPR.

45.     When Terry remained unresponsive, Defendant Board's Police Department employees finally brought in an automated external defibrillator (AED) device into Detention Cell 2, more than five minutes after discovering Terry's suicide attempt.

46.     Due to a lack of training, Defendant Board's Police Department employees did not know how to use the AED, and Detention Cell 2 video shows various officers reading the instructions and passing the AED components back and forth before finally attempting to activate the machine.

47.     Detention Cell 2 video also appears to show that Defendant Board's Police Department employees were never able to correctly activate the AED to apply an electrical shock to Terry's body.

48.     The foregoing acts of Defendant Board's Police Department employees delayed and interfered with the timely provision of aid to Terry.

49.     KCMO firefighters eventually arrived, and administered additional CPR, IV medication, and oxygen to Terry.

50.     KCMO firefighters transported Terry to Liberty Hospital, in Liberty, Clay County, Missouri, where he lay comatose before dying on December 31, 2019.

## COUNT II– Wrongful Death – General Negligence

51.     Plaintiff incorporates by reference all the allegations set forth above.

52.     Defendant Board's Police employees had been specifically advised of the serious medical conditions and needs of Terry Farmer, and of his prescription medications and acute intoxication, and knew or should have known of the serious and substantial risk of suicide presented by Terry.

53.     Defendant Board had to a duty to provide adequate medical care to address the needs of at-risk detainees, including Terry, and to take reasonable remedial or preventative measures to avert suicides and suicide attempts by detainees, including Terry.

54.     Defendant Board's Police employees were negligent, derelict, reckless, and breached their ministerial duties of care in the following respects:

a.     ignored Terry's obvious and severe mental illnesses, including depression, anxiety, and bipolar disorder, exacerbated by his intoxication, and substantial risk of suicide;

b.     failed to provide or obtain medical treatment and/or therapy for Terry's diagnosed conditions, including depression, anxiety, and bipolar disorder, exacerbated by his intoxication,  and substantial risk of suicide;

c.     failed to investigate Terry's mental illnesses and substantial risk of suicide sufficiently to make an informed judgment about his medical needs;

d.      made medical decisions about Terry's treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints, lack of staff, and indifference to Terry's well-being;

e.      delayed and/or interfered with Terry's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

f.      failed to take reasonable measures to abate the known risk of Terry's suicide;

g.      installed, and failed to remove, a dangerous item from Terry's cell or person that Terry could use to harm himself;

h.      failed to place Terry on suicide watch or closely monitor his cell and his behavior;

i.      failed to perform visual checks necessary to monitor Terrys' actions and condition;

j.      delayed and/or interfered with access to, and negligently and incompetently performed, emergency medical treatment after they found Terry hanging in his cell; and/or

k.      otherwise intentionally or recklessly disregarded Terry's right to adequate medical care.

55.      Additionally, Defendant Board maintained deficient and inadequate policies, customs and procedures and was negligent and careless, in that Defendant Board:

a.      failed to train and supervise administrators, officers, and dispatchers on suicide prevention, identification and/or monitoring of at-risk detainees, removal of dangerous conditions and items from cells, intake policies and procedures, and basic emergency responses to suicide attempts;

b. failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk detainees, identify and understand the effects of prescription medication, permitted dangerous items to remain with at-risk detainees and inadequately conducted video surveillance;

c. failed to enforce suicide prevention or response policies and procedures and to discipline officers for violations of such policies and procedures, and caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d. failed to adequately staff the Shoal Creek facility; and/or

e. otherwise were deliberately indifferent to or tacitly authorized wrongful, unconstitutional, negligent, reckless or intentional actions acts of their subordinates to the detriment of Terry and Plaintiff.

56. Defendant Board is liable for its own acts and omissions aforesaid, and for those of its Police employees under the doctrine of *respondeat superior*.

57. The aforesaid acts and omissions of Defendant Board, including those of its Police employees, directly and proximately caused or contributed to cause Terry's death.

58. The aforesaid acts and omissions of Defendant Board, including those of its Police employees, directly and proximately caused or contributed to cause Terry to endure pain and suffering between the time he entered Shoal Creek and the time of his death.

59. The aforesaid acts and omissions of Defendant Board, including those of its Police employees, directly and proximately caused or contributed to cause Plaintiff to suffer the

13

Electronically Filed - Clay - September 16, 2020 - 08:48 AM

loss of Terry's services, consortium, companionship, comfort, instruction, guidance, counsel, training and support.

60.     The aforesaid acts and omissions of Defendant Board, including those of its Police employees, directly and proximately caused or contributed to cause Plaintiff pecuniary losses, including but not limited to medical and funeral expenses.

61.     The aforesaid acts and omissions of Defendant Board, including those of its Police employees, directly and proximately caused or contributed to cause Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090.

62.     Further, the aforesaid acts and omissions of Defendant Board, including those of its Police employees, were willful, wanton and outrageous and displayed a conscious disregard and complete indifference to health and safety of Terry, and the rights of Plaintiff.

63.     At all relevant times, Defendant Board had purchased and/or carried liability insurance thereby waiving sovereign immunity pursuant to RSMo. § 537.610 or, alternatively, waived sovereign immunity pursuant to RSMo. § 537.600 by knowingly maintaining a dangerous condition on its premises which created a reasonably foreseeable risk of harm to detainee and which directly caused or contributed to cause injury to Terry and Plaintiff, as more fully set forth below and incorporated herein.

WHEREFORE, Plaintiff prays that the Court enter judgment in Count I herein in favor of Plaintiff and against Defendant Board awarding compensatory and non-economic damages in an amount that is reasonable and in excess of $25,000.00, and Plaintiff's costs incurred in this action, and such further relief as the Court deems just and proper.

## COUNT II – Wrongful Death – Dangerous Condition

64.     Plaintiff incorporates by reference all the allegations set forth above.

65.     Defendant Board was at all relevant times aware of the existence of the metal-corded telephone mounted on the wall of Detention Cell 2 at Shoal Creek.

66.     Defendant Board owns and operates Police stations and other facilities that include detention cells throughout Jackson, Clay, Platte and Cass counties.

67.     Defendant Board was at all relevant times aware that Detention Cell 2 would be used to detain individuals who were suffering from the effects of mental illness, in many cases exacerbated by the effects of alcohol or other drugs, and that some would find their circumstances so dire as to cause them to attempt to hang themselves.

68.     As an owner and operator of detention facilities, Defendant Board at all relevant times knew or should have known that metal-corded telephones, like the one in Detention Cell 2 at Shoal Creek, had been used by detainees in other places to hang themselves.

69.     Defendant Board's Detention Cell 2 at Shoal Creek was in a dangerous condition at the time of Terry Farmer's detention and injury, due to the presence in the cell of a metal-corded telephone with which suicidal detainees might hang themselves.

70.     Terry Farmer's injury and death directly and proximately resulted from his use of the dangerous condition – the metal-corded telephone – to hang himself.

71.     The dangerous condition – the metal-corded telephone in Detention Cell 2 - created a reasonably foreseeable risk that a suicidal detainee would hang himself.

72.     Defendant had actual notice that Terry Farmer was mentally and emotionally unstable, and suffered diagnosed mental conditions including depression, anxiety, and bipolar disorder, and had been warned that he might harm himself while detained.

73.     Defendant had actual notice of the dangerous condition in Detention Cell 2 sufficiently prior to the injury to have taken measures to protect Terry Farmer against the dangerous condition.

74.     Defendant Board could have protected Terry Farmer from the dangerous condition by removing the telephone from Detention Cell 2, by putting Terry in another cell that did not have a telephone, or by simply monitoring the cell through either the door glass or the video monitor that captured Terry's suicide.

75.     Defendant Board's failure to remove the dangerous condition from Detention Cell 2, or to otherwise protect Terry from it, directly and proximately caused or contributed to cause Terry's death.

76.     Defendant Board's failure to remove the dangerous condition from Detention Cell 2, or to otherwise protect Terry from it, directly and proximately caused or contributed to cause Terry to endure pain and suffering between the time he entered Shoal Creek and the time of his death.

77.     Defendant Board's failure to remove the dangerous condition from Detention Cell 2, or to otherwise protect Terry from it, directly and proximately caused or contributed to cause Plaintiff to suffer the loss of Terry's services, consortium, companionship, comfort, instruction, guidance, counsel, training and support.

78.     Defendant Board's failure to remove the dangerous condition from Detention Cell 2, or to otherwise protect Terry from it, directly and proximately caused or contributed to cause Plaintiff pecuniary losses, including but not limited to medical and funeral expenses.

79.     Defendant Board's failure to remove the dangerous condition from Detention Cell 2, or to otherwise protect Terry from it, directly and proximately caused or contributed to cause

16

Plaintiff and the group of beneficiaries she represents to suffer those injuries and available damages set forth in Mo. Rev. Stat. § 537.090.

80.     Further, Defendant Board's failure to remove the dangerous condition from Detention Cell 2, or to otherwise protect Terry from it, were willful, wanton and outrageous and displayed a conscious disregard and complete indifference to health and safety of Terry, and the rights of Plaintiff.

WHEREFORE, Plaintiff prays that the Court enter judgment in Count II herein in favor of Plaintiff and against Defendant Board awarding compensatory and non-economic damages in an amount that is reasonable and in excess of $25,000.00, and Plaintiff's costs incurred in this action, and such further relief as the Court deems just and proper.

## COUNT III - 42 U.S.C. § 1983

81.     Plaintiff incorporates by reference all the allegations set forth above.

82.     Plaintiff brings Count I of this cause of action against Defendant Board pursuant to 42 U.S.C. § 1983 for damages for Defendant Board's deprivation of Terry's constitutionally protected liberty rights by reason of Defendant Board's violation of Terry's substantive and due process rights pursuant to the Eighth and Fourteenth Amendments of the Constitution of the United States of America.

83.     Terry had a clearly established constitutional right to be protected from the known risk of suicide and to have his serious medical needs taken seriously and addressed.

84.     Defendant Board's Police Department employees knew of Terry's serious medical needs, including the serious, imminent and substantial risk of self-harm and suicide and need for screening, monitoring and assistance to prevent his death by hanging, but willfully and

recklessly failed to respond reasonably to these known risks and needs. Armed with this knowledge, Defendant Board's Police Department employees, acting alone and in concert, were deliberately indifferent to Terry's serious medical needs in that Defendant Board's Police Department employees:

a. ignored Terry's obvious and severe mental illnesses, including depression, anxiety, and bipolar disorder, exacerbated by his intoxication, and substantial risk of suicide;

b. failed to provide or obtain medical treatment and/or therapy for Terry's diagnosed conditions, including depression, anxiety, and bipolar disorder, exacerbated by his intoxication, and substantial risk of suicide;

c. failed to investigate Terry's mental illnesses and substantial risk of suicide sufficiently to make an informed judgment about his medical needs;

d. made medical decisions about Terry's treatment and/or therapy for his diagnosed conditions and substantial risk of suicide based on non-medical factors, such as budgetary constraints, lack of staff, and indifference to Terry's well-being;

e. delayed and/or interfered with Terry's access to treatment and/or therapy for his diagnosed conditions and substantial risk of suicide;

f. failed to take reasonable measures to abate the known risk of Terry's suicide;

g. installed, and failed to remove, a dangerous item from Terry's cell or person that Terry could use to harm himself;

h. failed to place Terry on suicide watch or closely monitor his cell and his behavior;

i. failed to perform visual checks necessary to monitor Terrys' actions and condition;

18

Electronically Filed - Clay - September 16, 2020 - 08:48 AM

j.      delayed and/or interfered with access to, and negligently and incompetently performed, emergency medical treatment after they found Terry hanging in his cell; and/or

k.      otherwise intentionally or recklessly disregarded Terry's right to adequate medical care.

85.     Further, Defendant Board, and Defendant Board's employees, as police officers, supervisors, and/or administrators having supervisory capacities, custody, keeping and charge of the Shoal Creek Police Station and its detainees, having notice that the training and supervision of the Police personnel were lawfully inadequate and likely to result in constitutional violations of detainees, including Terry, maintained unconstitutional policies, customs and procedures and were deliberately indifferent, in that they:

a.      failed to train and supervise administrators, officers, and dispatchers on suicide prevention, identification and/or monitoring of at-risk detainees, removal of dangerous conditions and items from cells, intake policies and procedures, and basic emergency responses to suicide attempts;

b.      failed to implement or require the implementation of a suicide prevention or response policy and procedure, or maintained inadequate suicide prevention and response and intake policies and procedures that did not identify and/or monitor at-risk detainees, identify and understand the effects of prescription medication, permitted dangerous items to remain with at-risk detainees and inadequately conducted video surveillance;

c.      failed to enforce suicide prevention or response policies and procedures and to discipline officers for violations of such policies and procedures, and caused, permitted,

19

and allowed a custom and practice of continued and persistent deviations from policies and procedures;

d.     failed to adequately staff the Shoal Creek facility; and/or

e.     otherwise were deliberately indifferent to or tacitly authorized acts of their subordinates that violated at-risk detainees' and Terry's constitutional rights.

86.     As a direct and proximate result of Defendant Board's constitutional violations set forth above, and as a direct and proximate result of Defendant Board's unconstitutional policies, customs, and procedures, combining, concurring and contributing, Terry's serious medical needs and known and obvious risk of self-harm were ignored, unmonitored, untreated and/or unidentified, Terry was permitted to remain in his cell with a dangerous metal-corded telephone, and Terry was enabled to hang himself and commit suicide.

87.     Defendant Board's constitutional violations and Defendant Board's unconstitutional policies, customs, and procedures, combining, concurring and contributing, were deliberately indifferent to the known and substantial risk of suicide and serious medical needs of Terry, and deprived him of his right to be free from cruel and unusual punishment and to due process of law as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

88.     As a direct and proximate result of Defendant Board's constitutional violations, and as a direct and proximate result of Defendant Board's unconstitutional policies, customs, and procedures, combining, concurring and contributing, Terry died on December 31, 2019.

89.     As a direct and proximate result of Defendant Board's constitutional violations and Defendant Board's unconstitutional policies, customs, and procedures, combining, concurring and contributing, Terry's mental condition deteriorated, Terry endured conscious pain

20

and suffering and Terry experienced a general decline in the quality of his life between the time he entered Shoal Creek and the time of his death.

90.     As a direct and proximate result of Defendant Board's constitutional violations and Defendant Board's unconstitutional policies, customs, and procedures, combining, concurring and contributing, Plaintiff has suffered pecuniary losses, including but not limited to, the loss of Terry's earnings and expenses associated with Terry's funeral.

91.     As a direct and proximate result of Defendant Board's constitutional violations and Defendant Board's unconstitutional policies, customs, and procedures, combining, concurring and contributing, Plaintiff was caused to suffer loss of services, companionship, comfort, instruction, guidance, counsel and support because of Terry's death.

92.     Further, the constitutional violations of Defendant Board, and each of them, as described above were outrageous because of their conscious disregard and reckless indifference to the rights of Terry.

WHEREFORE, Plaintiff prays the Court enter a judgment on Count III in favor of Plaintiff and against Defendant Board, awarding compensatory and non-economic damages in an amount that is reasonable and in excess of $25,000.00, and Plaintiff's reasonable attorney's fees and costs incurred in this action pursuant to 42 U.S.C. §§ 1983 and 1988, and such further relief as the Court deems just and proper.


JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues.

KELLY LAW OFFICE, P.C.

By: /s/ Mark E. Kelly
Mark E. Kelly, #33984
Lorry K. Kelly, #37969
Kett R. Craven, #39022
134 North Water Street
Liberty, MO  64068-2374
(816) 760-2000 Phone
(816) 760-2001 Fax
mkelly@kellylawoffice.legal
lkelly@kellylawoffice.legal
kcraven@kellylawoffice.legal
ATTORNEYS FOR PLAINTIFF

22