IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BRADLEY FARMER, INDIVIDUALLY, AS SURVIVING SPOUSE OF TERRY J. FARMER, DECEASED, AND IN HIS CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TERRY J. FARMER, DECEASED;<br><br>Plaintiff,<br><br>v.<br><br>KANSAS CITY, MISSOURI, BOARD OF POLICE COMMISSIONERS, SECURUS TECHNOLOGIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY, et al.,<br><br>Defendants. | Case No. 4:20-00801-CV-RK |

## ORDER

Before the Court is Defendant Securus Technologies, LLC's ("Securus") motion for summary judgment. (Doc. 108.) The motions are fully briefed. (Docs. 109, 115, 119, 120.) For the reasons below, Securus' motion for summary judgment (Doc. 108) is **GRANTED**.

**I. Facts**[1]

**A. Background**

The claims in Plaintiff Bradley Farmer's Amended Complaint all arise from the suicide of his husband, Terry Farmer, on December 28, 2019. (Doc. 109 at ¶¶ 1-2.) At the time, Terry Farmer was detained at the Shoal Creek Patrol Division ("Shoal Creek") in Kansas City, Missouri, in Detention Cell 2, where he used a telephone cord as a ligature to hang himself. (*Id.* at ¶ 2.)

Plaintiff Bradley Farmer (hereafter "Plaintiff") is both the surviving spouse of Terry Farmer and the Personal Representative of his estate. (*Id.* at ¶ 3.) Defendant Kansas City, Missouri, Board of Police Commissioners ("KCPD") manages and controls the police department of Kansas City, Missouri, its employees, and its facilities, including Shoal Creek. (*Id.* at ¶ 4.)

---

[1] Except where otherwise noted these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted some properly controverted facts, assertions that are immaterial to the resolution of the pending motion, assertions that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

Defendants Joseph M. Weidler, James C. Dennis, Dalton W. Clemons, and Shawn E. Davis were police employees of Defendant KCPD. (*Id.* at ¶ 5.) Defendant Securus is a telecommunications company that installs and services telecommunication systems and software in correctional agencies. (*Id.* at ¶ 6.) Securus and KCPD were parties to a contract under which Securus provided KCPD with a telecommunications system and related software, including the installation of telephones, for communication between detainees and their families, attorneys, and others. (*Id.* at ¶ 7.) Following installation of the telephones at Shoal Creek in 2012, Securus was available to provide telecommunications and maintenance services. (*Id.* at ¶ 20.) Any maintenance services involving an adjustment to the length of the telephone cord would require prior authorization or approval from KCPD. (*Id.* at ¶ 21.)

Shoal Creek had four detention cells, three of which contained telephones for detainees to use, while the fourth cell—referred to as an "isolation cell"—did not contain a telephone. (*Id.* at ¶ 12.) The isolation cell is generally reserved for detainees who are belligerent or who have been identified as a suicide risk. (*Id.* at ¶ 13.) The cell in which KCPD placed Terry Farmer on the night in question was Detention Cell 2, which contained a telephone. (*Id.* at ¶ 14.)

At KCPD's request, Securus serviced the telephone cord in Detention Cell 2 at Shoal Creek on November 14, 2017, by replacing a 12" cord with an 18" cord. (*Id.* at ¶ 22, Doc. 115-9 at ¶ 22, Doc. 109-9 at 15, 17.) Aside from that instance, Securus shortened telephone cords at Shoal Creek two other times, and each time the Securus technician was accompanied by a KCPD representative. (Doc. 109 at ¶¶ 22-23.) November 14, 2017, is the closest date prior to Terry Farmer's suicide that it is known Securus was at Shoal Creek at KCPD's request to service the telephone cord in Detention Cell 2. (*Id.* at ¶ 24.)

Before Terry Farmer's suicide, KCPD was aware of at least five instances of detainees attempting to commit suicide at Shoal Creek since July 21, 2015, of which, at least four instances involved detainees attempting to hang themselves using the telephone cord in their detention cell while detained at Shoal Creek. (*Id.* at ¶¶ 25-26.) In late July 2015, after one such attempt, KCPD arranged for Securus to come to Shoal Creek and shorten the telephone cords. (*Id.* at ¶ 27.) After another such attempt, on January 31, 2017, KCPD contacted Securus, and in response Securus stated the telephone cords were already too short to shorten, offering as an alternative to install "hands free phones" at Shoal Creek. (*Id.* at ¶¶ 28-9.) The phones were not then replaced. (*Id.* at ¶ 30.)

2

### B. Terry Farmer's Suicide

On December 27, 2019, Terry Farmer was involved in a motor vehicle crash, and upon the arrival of KCPD Officers Gormont and Graham, Terry Farmer appeared to them to be visibly intoxicated. (*Id.* at ¶¶ 31-33.) Following Terry Farmer's refusal to undergo a Standardized Field Sobriety Test, Officer Graham placed him under arrest for driving under the influence ("DUI"). (*Id.* at ¶ 34.) Plaintiff told Officer Gormont he was worried that Terry Farmer was going to hurt himself and asked Officer Gormont to "keep an eye on him." (*Id.* at ¶ 35.) Terry Farmer was then transported to Shoal Creek for processing. (*Id.* at ¶ 36.)

At Shoal Creek, DUI Officer Shawn Davis administered a DUI Screening, during which Terry Farmer submitted to a chemical sample of his breath, which revealed a blood alcohol concentration of .275. (*Id.* at ¶¶ 37-38.) Davis reported that during the screening, Terry Farmer disclosed that he was taking Xanax and had ingested two milligrams of Xanax on the morning of his arrest, and he informed Davis that he had mental conditions including bipolar, anxiety, and mood disorders. (*Id.* at ¶¶ 39-41.) After Davis finished meeting with Terry Farmer, he released Terry Farmer to detention personnel and advised Officer Graham to order an ambulance for Terry Farmer's transportation to a hospital for medical evaluation due to his high blood alcohol concentration. (*Id.* at ¶ 50.) Davis did not request a screening or treatment for Terry Farmer's psychological conditions or order any form of suicide watch. (*Id.* at ¶ 51.)

During his booking at Shoal Creek, Terry Farmer underwent a risk assessment separate from his DUI screening, which included a suicide screening that indicated Terry Farmer reported having "mental health problems." (*Id.* at ¶¶ 55, 57.) The suicide screening further indicated Terry Farmer reported being bipolar and having consumed alcohol within 24 hours of undergoing the screening, but it did not include Plaintiff's warning to Officer Gormont concerning Terry Farmer's risk of self-harm. (*Id.* at ¶¶ 58-60.)

Terry Farmer was taken to North Kansas City Hospital ("NKCH") where it was confirmed that he was intoxicated with alcohol. (*Id.* at ¶ 52.) Following medical evaluation, NKCH staff released Terry Farmer to return to Shoal Creek at approximately 12:30 a.m. on December 28, 2019. (*Id.* at ¶ 53.) NKCH provided discharge information including a written description of symptoms associated with moderate alcohol intoxication: "Erratic behavior . . . depression . . . Impaired judgment." (*Id.* at ¶ 54.)

3

Upon returning to Shoal Creek from NKCH, Desk Sergeant Joseph Weidler, the direct supervisor of the detention facility officers ("DFOs"), was on duty. (*Id.* at ¶¶ 61-62.) The DFOs on duty at the time were Defendants James Dennis and Dalton Clemons. (*Id.* at ¶ 64.) Dennis knew Terry Farmer, and based on his prior relationship with Terry Farmer, Dennis did not believe that Terry Farmer was suicidal. (*Id.* at ¶ 72.) Thus, Dennis did not place Terry Farmer in the isolation cell. (*Id.* at ¶ 72.) Dennis consulted with Clemons, and they decided not to place Terry Farmer in the isolation cell. (*Id.* at ¶ 74.) Dennis stated in his deposition that if he had processed another detainee who presented the same conditions as Terry Farmer, but without having a prior relationship, then Dennis would have placed that detainee in the isolation cell. (*Id.* at ¶ 73.)

DFOs are able to monitor detainees from the booking desk, which faces the detention cells, providing a direct line of sight into the see-through glass doors of Detention Cells 1, 2, and 3. (*Id.* at ¶ 77.) DFOs can also view camera feeds to all of the detention cells on a monitor on the booking desk. (*Id.* at ¶ 78.) From the desk sergeant's office, behind the booking desk, there is not a direct line of sight to the detention cells, but the desk is equipped with a monitor that provides a feed to the detention cells, in addition to additional camera feeds not provided on the DFO's monitor. (*Id.* at ¶¶ 79-82.)

While detained in Detention Cell 2, and in view of a video surveillance camera, Terry Farmer placed his neck into the telephone cord, secured the ligature by hanging the receiver on the telephone's cradle, and lowered himself until his full weight was hanging on the ligature. (*Id.* at ¶ 83.) Terry Farmer hanged from the telephone cord for approximately 12 minutes before anyone from Shoal Creek responded. (*Id.* at ¶ 84.) Clemons testified in a deposition that, during that time, he was initially at the booking desk, then went to the Weidler's desk. (Id. at ¶ 85.) He further testified he only glanced at the monitors a couple times and thought that Terry Farmer was using the phone, not hanging himself. (*Id.* at ¶ 85.) Dennis testified in a deposition that he was also away from the booking desk, that he was at Weidler's desk with Clemons, and that he also thought that Terry Farmer was using the phone on the monitor and not hanging himself. (*Id.* at ¶ 86.)

After Terry Farmer had been hanging for approximately 12 minutes, Clemons entered Terry Farmer's cell, unhooked the phone, began administering CPR, and then called for an ambulance. (*Id.* at ¶ 87.) When Terry Farmer remained unresponsive, Weidler attempted, unsuccessfully, to apply an electrical shock to Terry Farmer's body using an automated external defibrillator. (*Id.* at ¶¶ 88-89.) Kansas City Fire Department Firefighters then arrived at Shoal

4

Creek and transported Terry Farmer to Liberty Hospital in Liberty, Missouri, where he later died on December 31, 2019. (*Id.* at ¶ 90.)

      **C.**     **After Terry Farmer's Suicide**

Plaintiff filed his Amended Complaint on March 2, 2021, alleging a Missouri statutory wrongful death claim against the KCPD Board only (Count I); a claim for violation of 42 U.S.C. § 1983 against the KCPD Board and the individual KCPD defendants (Count II); a claim for strict products liability against Securus (Count III); and a claim for negligent products liability against Securus (Count IV). (Doc. 26 at ¶¶ 42-85.)

Additional relevant facts will be set forth as pertinent to the analysis of Securus' motion for summary judgment.

## II. Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted." *Smith-Bunge v. Wis. Central, Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted).

At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Rule 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Rule 56(e)). In so doing, the nonmoving party "cannot create sham

5

issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

### III. Discussion

Defendant Securus contends it is entitled to summary judgment on all claims against it, which include Plaintiff's Counts III (products strict liability) and IV (products negligence liability). (Doc. 108.)

As to both products liability claims, strict liability (Count III) and negligence (Count IV), Securus asserts Plaintiff cannot establish proximate causation because the intervening act of Terry Farmer's suicide constituted a superseding cause under three theories. (Doc. 109 at 20.) First, Securus argues the suicide was not a reasonable and probable consequence of Securus' alleged misconduct. (*Id.* at 22.) Second, Securus contends its alleged wrongdoing is, at most, a prior and remote cause. (*Id.* at 25.) And finally, Securus asserts KCPD and the detention officers' subsequent conduct constitutes a superseding cause, due to their knowledge of the phone cord. (*Id.* at 28.)

For purposes of determining proximate causation, foreseeability is relevant and "refers to whether a defendant could have anticipated a particular chain of events that resulted in injury or the scope of the risk that the defendant should have foreseen." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. 2000). Foreseeability in the context of determining proximate causation "relies upon hindsight to determine whether the precise manner of a particular injury was a natural and probable consequence of a negligent act." *Id.* Under Missouri law, generally, "[w]here the injury is death caused by a voluntary suicide, the suicide is considered a new and independent intervening act which breaks the causal connection between the allegedly negligent act and the death." *Eidson v. Reprod. Health Srvs.*, 863 S.W.2d 621, 627 (Mo. App. E.D. 1993); *Neurological Med., Inc. v. Gen. Am. Life Ins. Co.*, 921 S.W.2d 64, 66–67 (Mo. App. E.D. 1996); *Beer v. Upjohn Co.*, 943 S.W.2d 691, 693 (Mo. App. E.D. 1997).

For causation to be submissible to a jury, "a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death." *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 309 (Mo. banc 2011) (citing *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. banc 2001); *Eidson*, 863

S.W.2d at 627). "Proximate cause—which is a question for the court—is established by evidence that the injury or death suffered was 'the natural and probable consequence of defendant's conduct.'" *Id.* (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. banc 1993)).

In the context of a voluntary suicide, this showing can be made "by presenting evidence that the decedent's suicide was the 'natural and probable consequence' of the injury he suffered at the hands of the defendant . . . which may require expert witness testimony if no direct evidence is available[.]" *Id.* If Plaintiff has no such evidence, "the suicide would be an intervening cause and the claim could not be submitted to the jury." *Id.* at 309-10. "If, however, the plaintiff presents evidence that the suicide resulted from the injury, the claim then can be submitted to the jury to decide as a question of fact whether the suicide is a direct result of the defendant's negligence." *Id.* at 310. *Kivland* has been summarized as follows:

> In *Kivland*, the decedent was paralyzed from the waist down after undergoing spinal surgery. He suffered intense pain in the paralyzed region and efforts to alleviate the pain failed. Eight months after he filed a medical malpractice action against the surgeon, the decedent committed suicide. His family amended his suit to include a wrongful death claim for the suicide. The *Kivland* plaintiffs relied on the testimony of a medical expert that the decedent's suicide resulted from the pain caused by the surgery. The decedent's surgeon moved for partial summary judgment on the action's claims for wrongful death and lost chance of survival, asserting that the decedent's suicide was an independent intervening act, and that, as a matter of law, the surgeon could not be responsible for the decedent's death. As to the wrongful death claim, the Court rejected the surgeon's request to make a general exception to the causation standard when the death is by suicide, and instead held that plaintiffs can show that a defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the suicide was the "natural and probable consequence" of the injury the decedent suffered at the hands of the defendant. The Court held that the *Kivland* plaintiffs had met this burden.

*Haynes v. Williams*, No. 1:21-CV-160-ACL, 2022 WL 2064613, at *5 (E.D. Mo. June 8, 2022) (citing and quoting *Kivland* throughout).

In contrast to the direct connection shown in *Kivland*, "[i]f the facts involve[] an extended scenario involving multiple persons and events with potential intervening causes, then the requirement that the damages that result be the natural and probable consequence of defendant's conduct comes into play and may cut off liability." *Callahan*, 863 S.W.2d at 865. And, "'[i]f a prior and remote cause does nothing more than give rise to an occasion by which an injury is made possible, and there intervenes between that cause and the injury a distinct and unrelated cause of

7

injury, a negligence action does not lie, even though the 'but-for' test is satisfied.'" *Silva v. Constr. & Abatement Servs., Inc.*, 238 S.W.3d 679, 682 (Mo. App. 2007) (quoting *Tompkins v. Cervantes*, 917 S.W.2d 186, 191 (Mo. App. 1996)).

Here, it cannot be said that Terry Farmer's suicide was the natural and probable consequence of Securus replacing a worn or frayed 12-inch cord with an 18-inch phone cord in Detention Cell 2 at Shoal Creek. To the contrary, this case involves an "extended scenario involving multiple persons and events with potential intervening causes[.]" *Callahan*, 863 S.W.2d at 865. Securus' replacement of the cord "[did] nothing more than give rise to an occasion by which an injury [was] made possible, and there intervene[d] between that cause and the injury a distinct and unrelated cause of injury." *Silva*, 238 S.W.3d at 682. Multiple potential intervening causes followed the replacement of the cord, including actions and omissions by the KCPD defendants at Shoal Creek and Terry Farmer's own conduct in using the telephone to hang himself. Accordingly, Plaintiff cannot show Securus is liable for products liability negligence as a matter of law.

As to Plaintiff's strict liability claim, Missouri law requires a plaintiff to show defendant transferred a product in the course of his business; the product was used in a manner reasonably anticipated; and either "[t]he product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold;" or "[t]he product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning." Mo. Ann. Stat. § 537.760. "The Missouri Supreme Court first adopted strict tort liability in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo. 1969)." *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 791 (Mo. Ct. App. 2008) (citing *Richcreek v. Gen. Motors Corp.*, 908 S.W.2d 772, 775 (Mo. Ct. App. 1995). "*Keener* involved a defect in a product's manufacturing process and the court adopted the strict liability rule set forth in section 402A of the Restatement (Second) of Torts." *Id.* "Strict liability was extended to design defects in *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo. banc 1977). *Id.*

There is a manufacturing defect when the product is not in its intended condition due to something going wrong in the manufacturing process, and under those circumstances, the product is compared to the standards of the manufacturer and to like products. *Id.* at 791-92. There is a

8

design defect when the product, although in the condition intended by the manufacturer, is unreasonably dangerous by the nature of its design when put to normal use. *Id.* at 792.

Here, no party argues the phone cord was defective, and the Court finds Terry Farmer was not without knowledge of the cord's characteristics when he put it to use as a ligature. The subject phone cord was in its intended condition and, when put to normal use, was not unreasonably dangerous by nature of its design. Accordingly, Plaintiff cannot show Securus is liable for strict products liability as a matter of law.

## IV. Conclusion

Accordingly, Securus' motion for summary judgment (Docs. 108) is **GRANTED.**

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: September 2, 2022