# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| BRADLEY FARMER, INDIVIDUALLY, AS SURVIVING SPOUSE OF TERRY J. FARMER, DECEASED, AND IN HIS CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TERRY J. FARMER, DECEASED; <br><br> Plaintiff, <br><br> v. <br><br> KANSAS CITY, MISSOURI, BOARD OF POLICE COMMISSIONERS, et al., <br><br> Defendants. | Case No. 4:20-00801-CV-RK |

## ORDER

Before the Court is a motion for summary judgment filed by Defendants Kansas City, Missouri, Board of Police Commissioners, through its members, Mark Tolbert, Cathy Dean, Don Wagner, Dawn Cramer, and Quinton Lucas, ("the Board") and Shawn Davis, Joseph Weidler, James Dennis, and Dalton Clemons' (collectively "the KCPD Defendants"). (Doc. 110.) The motion is fully briefed. (Docs. 113, 114, 119.) For the reasons below, the KCPD Defendants' motion for summary judgment is **GRANTED.**

## Background[1]

This case arises from the death of Terry Farmer, who hung himself with a metal phone cord inside a jail cell at Shoal Creek Patrol Station on December 28, 2019. (Doc. 110 at ¶1.) Terry Farmer was then taken to a hospital, and he died three days later. (*Id.* at ¶ 2.) Plaintiff Bradley Farmer is Terry Farmer's surviving spouse. (*Id.* at ¶ 3.) Defendant Kansas City, Missouri, Board of Police Commissioners ("Board") owned and maintained Shoal Creek. (*Id.* at ¶ 4.) Defendants Shawn Davis, Joseph Weidler, James Dennis, and Dalton Clemons are Defendant Board's employees. (*Id.* at ¶ 5.)

---

[1] Except where otherwise noted these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted some properly controverted facts, assertions that are immaterial to the resolution of the pending motion, assertions that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

On December 27, 2019, around 8:30 p.m., KCPD Officers Winston Graham and Greg Gormont arrested Terry Farmer for driving under the influence ("DUI") and transported him to Shoal Creek. (*Id.* at ¶ 6.) Before they left the scene for Shoal Creek, Plaintiff told Officer Gormont, "make sure KCPD personnel keep an eye on [Terry]" and warned him the arrest might exacerbate Terry Farmer's mental and emotional conditions, and Terry Farmer might present a danger to himself. (*Id.* at ¶¶ 7-8.) Officer Gormont assured Plaintiff that Terry Farmer would be safe in custody, and that "they can see in the cells with cameras." (*Id.* at ¶ 9.) Plaintiff's warning to Officer Gormont concerning Terry Farmer's risk of self-harm was not included in the Arrest Record. (Doc. 114 at ¶ 117.) The arresting officers did not provide the booking room, including Detention Officer Dalton Clemons, any information regarding Terry Farmer. (*Id.* at ¶ 118.)

At Shoal Creek, Shawn Davis, a DUI officer, investigated Terry Farmer's impairment. (Doc. 110 at ¶ 10.) In his report, Davis described Terry Farmer's attitude as "mood swings" because Davis believed Terry Farmer's demeanor was up and down in that he was upset when Davis told him he could not leave but was content when talking about his job and family. (*Id.* at ¶ 11.) Davis believed Terry Farmer's up-and-down demeanor was not unusual. (*Id.* at 12.) Davis asked Terry Farmer whether he had any temporary or long term physical or mental conditions, to which Terry Farmer replied, bipolar disorder, anxiety disorder, and mood disorder. (*Id.* at ¶¶ 13-14.) Davis asked Terry Farmer whether he was taking any tranquilizers, pills, medicines, injections, or drugs of any kind, such as insulin, to which Terry Farmer replied that he was taking Xanax. (*Id.* at ¶¶ 15-16.) Terry Farmer never told Davis he was depressed, suicidal, wanted to hurt himself, or anything similar. (*Id.* at ¶ 17.)

Terry Farmer submitted a breath sample, the testing of which showed results of a blood alcohol concentration ("BAC") of .275. (*Id.* at ¶ 19.) KCPD policy requires medical evaluation of arrestees with .250 or higher BAC, because .250 BAC is the onset of alcohol poisoning. (*Id.* at ¶ 20.) Davis had Terry Farmer transported to a hospital for medical evaluation and did not see him again after that. (*Id.* at ¶¶ 21-22.) At the hospital, staff checked Terry Farmer's vital signs, confirmed his intoxication, and counseled him about the expected hangover and the effects of alcohol on the body. (*Id.* at ¶ 23.) Terry Farmer was then released to return to Shoal Creek at 12:30 a.m. on December 28, 2019. (*Id.* at ¶ 24.)

At Shoal Creek, the booking records indicate Terry Farmer answered the questions of KCPD's Suicide Screening, administered as part of the risk assessment KCPD detention officers perform of each detainee as part of the intake process, as follows:

    (a) Have you ever attempted suicide?  Answer:  No.

    (b) Are you taking any medication for depression?  If yes, what?  Answer:  No.

    (c) Have you ever been in a mental institution?  Answer:  No.

    (d) Do you have any mental health problems?  Answer:  Yes.

    (e) Have you ever intentionally overdosed?  Answer:  No.

    (f) Comment:  BIPOLAR.

(*Id.* at ¶¶ 25, 32.)  According to the booking records maintained by KCPD, Terry Farmer also answered the following:

    (a) Have you consumed alcohol in the last 24 hours?  Answer:  Yes.

    (b) Have you used any drugs or medications not prescribed by you in the past 24 hours?  Answer:  No.

    (c) Are you currently taking medication?  Answer:  No.

(*Id.* at ¶ 33.)  According to the metadata of Terry Farmer's booking records, on December 28, 2019, at 12:38 a.m., "D. Clemons" entered the answers to the risk assessment questions, including the answers to the Suicide Screening, and later, at 1:12 a.m., "D. Clemons" changed the answer from "no" to "yes" for the question, "do you have any mental health problems?" and added "bipolar" to the comments.  (*Id.* at ¶¶ 34-35.)

When Detention Officers James Dennis and Dalton Clemons started their shift on December 27, 2019 at 11:00 p.m., Terry Farmer was still at the hospital.  (*Id.* at ¶ 36.)  They knew he was there to get medically fit for confinement due to his high BAC level.  (*Id.* at ¶ 37.)  When Terry Farmer returned from the hospital, he told Clemons and Dennis he was bipolar.  (*Id.* at ¶ 38.)  To Clemons, bipolar disorder means "moods go up and down."  (*Id.* at ¶ 39.)

Shoal Creek has a video monitoring system, and each of its four detention cells has a camera inside it.  (*Id.* at ¶¶ 41-42.)  According to Clemons' testimony, "[a]t first, [Terry] was fine. [Clemons] was able to get his fingerprints, take his picture, put him. . . into the cell . . . [a]s it continued, he seemed a little agitated and didn't want to be there."  (*Id.* at ¶ 43.)  While Terry Farmer was in his cell, Clemons sometimes watched Terry Farmer with direct sight and on the monitor, but he did not watch him consistently or closely.  (*Id.* at ¶ 40, Doc. 118 at ¶ 40.)  Rather,

Clemons was "poking at his cell phone" at the time that Terry Farmer put the phone cord around his neck and hung himself, and after a couple minutes, Clemons put the cell phone away and left the detention facility officer area ("detention room") without looking at the monitor or into Terry Farmer's cell. (*Id.*) Clemons testified that Terry Farmer paced back and forth, first outside his cell, then continued to pace after he was inside his cell, and that Terry Farmer was "freaking out a little bit" because he did not want to be in detention; but Clemons had seen that with other inmates and believed it was normal. (Doc. 110 at ¶¶ 44-45.) Terry Farmer never told Clemons he was suicidal or wanted to harm himself. (*Id.* at ¶ 46.)

Dennis had personally known Terry Farmer for about a year because Terry Farmer was the director at Dennis' children's daycare. (*Id.* at ¶¶ 47, 49-50.) Dennis would see Terry Farmer when he dropped off or picked up his children from the daycare. (*Id.* at ¶ 51.) Dennis also saw Terry Farmer about two weeks earlier at the children's Christmas program. (*Id.* at ¶ 52.) Dennis had discussions with Terry Farmer about Dennis' children, who also had a personal relationship with Terry Farmer; they loved him, and Dennis' youngest child always ran up to Terry Farmer to play with him. (*Id.* at ¶ 53.)

Based on Dennis' relationship with Terry Farmer, he did not believe Terry Farmer was suicidal as Terry Farmer "never talked about depression or anything like that." (*Id.* at ¶ 48.) To Dennis, Terry Farmer "never seemed like someone that would want to take his own life." (*Id.*) Dennis also testified that at Shoal Creek, Terry Farmer "wasn't causing any issues" and "didn't show any signs that he was going to hurt himself." (*Id.* at ¶ 55.) While Terry Farmer was in his cell, Dennis recalled Terry Farmer pacing, lying on the bench, and using the phone. (*Id.* at ¶ 56.)

Dennis testified that when a detainee's Suicide Screening indicates the presence of mental health problems, the detainee has been identified as a suicide risk, and the proper procedure is to place the detainee in the isolation cell. (Doc. 114 at ¶ 120.) Despite Terry Farmer's Suicide Screening indicating the presence of mental health problems, he was placed in Detention Cell 2, which has a telephone, rather than the isolation cell, which does not have a telephone. (*Id.*, at ¶ 121.) Dennis stated that if he had processed another detainee who had presented the same conditions as Terry Farmer but with whom he did not have a prior relationship, then Dennis would have placed that detainee in the isolation cell. (*Id.* at ¶ 123.) Dennis consulted with Clemons, and they decided not to place Terry in the isolation cell; rather, they put him in Detention Cell 2. (*Id.* at ¶ 124.)

On duty when Terry Farmer hung himself along with Clemons and Dennis was Sergeant Joseph Weidler, who has worked as a desk sergeant for about 14 years. (Doc. 110 at ¶ 57.) One of Weidler's duties was to oversee the detention area by observing the detention cell monitors by using his desk top computer that displayed live footage on video monitors from all Shoal Creek cameras. (*Id*. at ¶¶ 58, 61.) The display included multiple individual video monitors that were each about two inches by three inches by default, and Weidler could configure the monitors to be expanded, contracted, or eliminated from the screen. (*Id*. at ¶ 62, Doc. 118 at ¶ 62.) Weidler's desk was directly adjacent to the detention area, and from his desk, he could not see inside the detention area by his direct line of sight. (Doc. 110 at ¶¶ 59-60.)

Weidler testified it was his practice to observe detainees on the monitors on his desk every five to 10 minutes, even if a detainee answered "no" to all of the Suicide Screening questions. (*Id*. at ¶ 63.) When observing detainees, Weidler looked for any irregular behavior such as banging on the walls, rocking in place, taking off clothing, urinating on the floor, or wiping fecal matter on the wall. (*Id*. at ¶ 64.) In Weidler's experience, irregular behaviors may indicate a detainee has mental health issues. (*Id*. at ¶ 65.) Weidler testified that behavior indicating a detainee wanted to harm himself would be specific statements about wanting to harm himself or actions, such as wrapping his hands around his neck or running full speed into a wall. (*Id*. at ¶ 66.) Weidler did not recall seeing Terry Farmer display any irregular behavior or behavior indicating he wanted to harm himself from the monitor. (*Id*. at ¶ 67.) No detention officer notified Weidler that Terry Farmer reportedly wanted to harm himself or demonstrated behavior that he wanted to harm himself. (*Id*. at ¶ 68.)

Around 2:00 am, Terry Farmer wrapped the phone cord around his neck, while Clemons was still in the detention room. (*Id*. at ¶ 69.) If Clemons would have looked up or looked around his computer monitor, he could have seen Terry Farmer in his cell with the phone cord around his neck. (*Id*. at ¶ 70.). While Terry Farmer was hanging himself in his cell, Dennis and Clemons left the detention room and were at Weidler's desk. (*Id*. at ¶ 71.) Dennis testified he and Clemons were at Weidler's desk and out of the detention room for more than 12 minutes. (*Id*. at ¶ 72.) Clemons testified that while he was at Weidler's desk, he "probably glanced at [the monitor] twice," and from the monitor, it looked like Terry Farmer was using the phone. (*Id*. at ¶ 73.) Dennis testified that while he was at Weidler's desk, on the monitor it looked like Terry Farmer was using the phone and he could not see the phone cord wrapped around Terry Farmer's neck.

5

(*Id.* at ¶¶ 74-75.) Weidler did not see Terry Farmer with a phone cord around his neck, in person or on the monitor. (*Id.* at ¶ 76.) Weidler believes he and the detention officers could have seen Terry Farmer with the phone cord around his neck on the monitor if they had paid really close attention to see that Terry Farmer was not using the phone. (*Id.* at ¶ 77.) Weidler testified it would be difficult to see a detainee with a phone cord around his neck on his monitor because the monitor is small; he further testified it was very common to see detainees sitting under the phones when using them, like Terry Farmer was sitting, so Weidler would have to have a reason to believe the detainee is not using the phone. (*Id.* at ¶ 78.)

When Clemons returned to the detention room from Weidler's desk, he looked up at Terry Farmer, and it appeared that Terry Farmer was using the phone. (*Id.* at ¶ 79.) However, Clemons noticed the coloring in Terry Farmer's face looked off, so he ran toward Terry Farmer's cell, and Dennis ran after him. (*Id.*) Clemons first saw the phone cord around Terry Farmer's neck when he was right in front of Terry Farmer's cell door. (*Id.* at ¶ 80). Dennis and Clemons took the phone cord off Terry Farmer's neck, started chest compressions, and yelled at the sergeant to call EMS. (*Id.* at ¶ 81.) Terry Farmer hung on the phone cord for more than eleven minutes and thirty seconds before Dennis and Clemons entered his cell. (*Id.* at ¶ 82.)

During Clemons' service as a DFO for KCPD, there had never been any attempted suicides other than Terry Farmer. (*Id.* at ¶ 83.) Dennis did not know about other detainee suicide attempts with phone cords until after Terry Farmer hung himself. (*Id.* at ¶ 84.) Weidler testified that Terry Farmer's is the only suicide with a phone cord at KCPD that he is aware of. (*Id.* at ¶ 85.) Prior to Terry Farmer's suicide, Weidler had heard of other suicide attempts with phone cords at KCPD but had first-hand knowledge of only one. (*Id.* at ¶ 87.) In January of 2017 at Shoal Creek, a detention officer told Weidler a detainee was attempting to hang himself with a phone cord, at which time Weidler and the detention officer rushed into the cell, pulled the detainee off the phone cord, and called for an ambulance; the detainee survived. (*Id.* at ¶ 88.)

Sometime after Terry Farmer's suicide, KCPD removed all phones from its detention cells. (*Id.* at ¶ 86.)

## Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and

giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted." *Smith-Bunge v. Wis. Central, Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted).

At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Rule 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Rule 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

## Discussion

The KCPD Defendants argue they are entitled to summary judgment on all claims against them, which include Plaintiff's Count I (Missouri statutory wrongful death claim against the Board only) and Count II (violation of 42 U.S.C. § 1983 against the Board and the individual defendants). (Doc. 110).

### I. Wrongful Death – Dangerous Condition

In Count I, Plaintiff brings a Missouri wrongful death claim against the Board under a theory of negligence, alleging the Board created a dangerous condition by having a corded phone inside Detention Cell 2. (Doc. 26 at ¶¶ 43-47.) Plaintiff alleges this dangerous condition waives the Board's sovereign immunity, which would otherwise bar this claim. (*Id.* at ¶ 55.) The KCPD

Defendants contend Plaintiff cannot establish that Terry Farmer's death directly resulted from the alleged dangerous condition of a corded phone placed inside his cell without intervention by Terry Farmer's intentional act of suicide. (Doc. 110 at 11, 13.) They also argue that failures to act do not qualify as dangerous conditions. (*Id.* at 13.)

Section 537.600, Mo. Rev. Stat., provides that public entities are protected by sovereign immunity except under certain circumstances, including a dangerous condition of the public entity's property, created by an employee in the course of employment or of which the public entity had actual or constructive notice.[2] The statutory provisions that waive a public entity's sovereign immunity are strictly construed. *Necker v. City of Bridgeton*, 938 S.W.2d 651, 654 (Mo. Ct. App. 1997).

At issue in this case is subsection 1(2), governing the exception for a dangerous condition. To benefit from the statutory waiver of sovereign immunity provided in § 537.600.1(2), a plaintiff must prove the following elements:

(1) that the property was in dangerous condition at the time of the injury,

---

[2] Section 537.600 provides, in relevant part:

1. Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the public entity from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances:

(1) Injuries directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment;

(2) Injuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition. . . . .

2. The express waiver of sovereign immunity in the instances specified in subdivisions (1) and (2) of subsection 1 of this section are absolute waivers of sovereign immunity in all cases within such situations whether or not the public entity was functioning in a governmental or proprietary capacity and whether or not the public entity is covered by a liability insurance for tort.

8

(2) that the injury directly resulted from the dangerous condition-that is, that the dangerous condition was the proximate cause of the injury, *see Stanley v. City of Independence*, 995 S.W.2d 485, 488 (Mo. banc 1999);

(3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred; and

(4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

*Thomas v. Clay Cnty. Election Bd.*, 261 S.W.3d 574, 577-78 (Mo. Ct. App. 2008) (quoting *Hensley v. Jackson Cnty.*, 227 S.W.3d 491, 496 (Mo. banc 2007)).

"For property to be dangerous, there must be some defect, physical in nature." *Necker*, 938 S.W.2d at 655 (citing *Alexander v. State*, 756 S.W.2d 539, 542 (Mo. 1988)). A condition is dangerous if "its existence, without intervention by third parties, posed a physical threat to plaintiff." *Alexander*, 756 S.W.2d at 542. "A 'third party' is someone whose act intervenes but who is not connected to the state in any kind of employment or agency relationship." *Cain v. Mo. Highways & Transp. Comm'n*, 239 S.W.3d 590, 596 (Mo. 2007).

Fatal to Plaintiff's claim in this case, "[t]he placement of an individual in relation to non-defective property does not constitute a dangerous condition of the property." *J.M. v. Lee's Summit Sch. Dist.*, 545 S.W.3d 363, 369-70 (Mo. Ct. App. 2018) (citing *Rodgers v. City of North Kansas City*, 340 S.W.3d 154, 159 (Mo. App. W.D. 2011); *Goben v. Sch. Dist. of St. Joseph*, 848 S.W.2d 20, 22-23 (Mo. App. W.D. 1992) (holding that a child instructed to jump a hurdle on a cement floor did not constitute a dangerous condition of property); *Necker*, 938 S.W.2d at 655 (holding that a child playing on a non-defective balance beam unattended did not constitute a dangerous condition of property); *Stevenson v. City of St. Louis Sch. Dist.*, 820 S.W.2d 609, 612-13 (Mo. App. E.D. 1991) (holding that a child sliding down a non-defective stairwell did not constitute a dangerous condition of property); *Lackey v. Iberia R-V Sch. Dist.*, 487 S.W.3d 57, 60 (Mo. App. S.D. 2016) (holding that organizing a game of 'long base' where the 'base' was in close proximity of the wall does not constitute a dangerous condition of property)). Further, "no Missouri case has ever upheld a negligence action against police officers when an inmate or detainee has committed suicide." *Coleman v. City of Pagedale*, No. 4:06-CV-01376-ERW, 2008 WL 2439747, at *2 (E.D. Mo. June 16, 2008).

It is undisputed that the corded phone in Detention Cell 2 was not defective or intrinsically dangerous. The corded phone was not altered or modified in such a way as to become defective

9

or intrinsically dangerous. The Board using the phone cord for its intended purpose did not create a dangerous condition of the property. "'What [Plaintiff] seeks is to engraft upon the term 'dangerous condition' any and all conditions or events which, if foreseeable, cause or produce injury arising out of or in conjunction with the property or employees of a public entity. If [Plaintiff's] argument were carried to its logical conclusion, [§] 537.600(2) [now § 537.600.1(2)] would become a nullity.'" *J.M.*, 545 S.W.3d at 370 (quoting *Johnson v. City of Springfield*, 817 S.W.2d 611, 615 (Mo. App. S.D. 1991)). If the Court were to adopt Plaintiff's dangerous condition theory, "the exception would engulf the rule." *Id.*

Employing strict construction to the statutory provisions that waive a public entity's sovereign immunity, the Court finds Plaintiff cannot establish as a matter of law that the Board waived its sovereign immunity by the placement of Terry Farmer in relation to the non-defective corded phone because this does not constitute a dangerous condition of the property.[3] Defendants' motion for summary judgment is accordingly granted as to Plaintiff's Count I.

## II. Violation of 42 U.S.C. § 1983

In Count II, Plaintiff brings a claim for violation of 42 U.S.C. § 1983 against the Board and the individual defendants, alleging they violated his substantive due process rights under the Eighth and Fourteenth Amendments to have his serious medical needs taken seriously and addressed and to be protected from the known risk of suicide. (Doc. 26 at ¶¶ 57-58.) Plaintiff alleges the KCPD Defendants knew of Terry Farmer's serious medical needs, including the serious, imminent, and substantial risk of self-harm and suicide and need for screening, monitoring, and assistance to prevent his death by hanging, but willfully and recklessly failed to respond reasonably to these known risks and needs. (*Id.* at ¶ 59.)

The KCPD Defendants argue Plaintiff cannot establish that the individual defendants knew Terry Farmer presented a substantial suicide risk. (Doc. 110 at 15-16.) The KCPD Defendants further suggest that, even assuming the individual defendants violated Terry Farmer's Eighth Amendment right, that right was not clearly established in this case and so qualified immunity applies. (*Id.* at 18.) Finally, based on their arguments that there are no underlying constitutional

---

[3] Because the Court finds as a matter of law there was no dangerous condition, the Court does not address Plaintiff's additional allegations regarding the failure to protect Terry Farmer from the allegedly dangerous condition and the failure to remove the allegedly dangerous condition. (Doc. 26 at ¶¶ 52-54.)

10

violations by the individual defendants, the KCPD Defendants argue Plaintiff's supervisory claim against the Board must fail. (Doc. 110 at 20.)

"'Qualified immunity shields an officer from suit when [he or] she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.'" *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotation omitted). Put another way, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citation and quotation marks omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)) (internal quotation marks omitted).

The Court uses a two-part test to determine whether a government official is entitled to qualified immunity. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014). The first part of this test is to determine "whether the facts alleged, construed in the light most favorable to [Plaintiff], established a violation of a constitutional or statutory right." *Id.* The second part of this test is to determine "whether that right was clearly established at the time of the alleged violation, such that a reasonable officer would have known his actions were unlawful." *Id.*

"It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "The Fourteenth Amendment extends this protection to pretrial detainees." *Whitney v. City of St. Louis, Mo.*, 887 F.3d 857, 860 (8th Cir. 2018). It was also well established on December 27, 2019, that a risk of suicide by an inmate is a serious medical need. *Gregoire*, 236 F.3d at 417 (citing *Rellergert v. Cape Girardeau Cnty.*, 924 F.2d 794 (8th Cir. 1991)). "To prevail on his deliberate indifference claim, [Plaintiff] must show that (1) [the individual defendants] had actual

knowledge that [Terry Farmer] had a substantial risk of suicide and (2) [they] failed to take reasonable measures to abate that risk." *Whitney*, 887 F.3d at 860.

The KCPD Defendants specifically argue that individual defendants Davis, Clemons, Dennis, and Weidler did not subjectively know Terry Farmer was a substantial risk for suicide "because Terry never told anyone at Shoal Creek, and his behavior never demonstrated, he was suicidal, depressed, or wanted to harm himself." (Doc. 110 at 16.) Plaintiff argues that everyone involved in Terry Farmer's arrest, transport, and incarceration was aware that he was extremely intoxicated, that Davis, Clemons, and Dennis also knew that Terry Farmer was bipolar well before he committed suicide, and that Davis knew that Terry Farmer was taking Xanax for anxiety. (Doc. 113 at 10.)

The evidence Plaintiff points to in this regard, however, is insufficient. There is no evidence upon which a reasonable finder of fact could conclude that any of the individual defendants was actually and subjectively aware of a risk that Terry Farmer might inflict harm upon himself. At no time during his confinement did Terry Farmer threaten to commit suicide or otherwise indicate that he might commit suicide. At no time during Terry Farmer's confinement did anyone communicate to any of the individual defendants that Terry Farmer was a suicide risk.

In particular, Plaintiff's warning to Officer Gormont concerning Terry Farmer's risk of self-harm was not included in the Arrest Record. (Doc. 114 at ¶ 117.) Davis believed Terry Farmer's up-and-down demeanor was not unusual. (Doc. 110 at 12.) To Clemons, bipolar disorder means moods go up and down. (*Id.* at ¶ 39.) Clemons testified that Terry Farmer paced back and forth, first outside his cell, then continued to pace after he was inside his cell, and that Terry Farmer was "freaking out a little bit" because he did not want to be in detention; but Clemons had seen that with other inmates and believed it was normal. (*Id.* at ¶¶ 44-45.) Based on Dennis' relationship with Terry Farmer, he did not believe Terry Farmer was suicidal as Terry Farmer "never talked about depression or anything like that." (*Id.* at ¶ 48.) To Dennis, Terry Farmer "never seemed like someone that would want to take his own life." (*Id.*) Dennis also testified that at Shoal Creek, Terry Farmer "wasn't causing any issues" and "didn't show any signs that he was going to hurt himself." (*Id.* at ¶ 55.) Weidler did not recall seeing Terry Farmer display any irregular behavior or behavior indicating he wanted to harm himself from the monitor. (*Id.* at ¶ 67.)

The only conceivable prior indication that Terry Farmer was predisposed to harm himself was that he disclosed that he was bipolar and taking Xanax. But "a prison official's 'failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be considered as the infliction of punishment.'" *Lambert v. City of Dumas*, 187 F.3d 931, 937 (8th Cir. 1999) (citing *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). The individual defendants may have made "bad guesses in gray areas" but they have not been shown to have "transgresse[ed] bright lines" as required for liability. *Stanton*, 571 U.S. at 6. Even if the individual defendants should have known of the risk that Terry Farmer posed to himself, Plaintiff has failed to show any of them actually knew of this risk.

Because Plaintiff fails to show the individual KCPD Defendants had actual knowledge that Terry Farmer had a substantial risk of suicide, his claim of deliberate indifference fails. *Whitney*, 887 F.3d at 860.

Based on their arguments that there are no underlying constitutional violations by the individual defendants, the KCPD Defendants contend Plaintiff's supervisory claim against the Board must fail. (Doc. 110 at 20.) The Court agrees.

"A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978)). Failure to train and failure to supervise claims cannot be sustained absent an underlying constitutional violation by the officers. *Sitzes v. City of W. Memphis Ark.*, 606 F.3d 461, 470-71 (8th Cir. 2010) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability.")).

Because the Court found no underlying constitutional violations by the individual defendants, Plaintiff's supervisory and failure to train claims against the Board fail as a matter of law. Accordingly, the KCPD Defendants' motion for summary judgment is granted as to Plaintiff's Count II.

13

**Conclusion**

Accordingly, the KCPD Defendants' motion for summary judgment (Doc. 110) is **GRANTED.**

**IT IS SO ORDERED.**

                                                s/ Roseann A. Ketchmark
                                                ROSEANN A. KETCHMARK, JUDGE
                                                UNITED STATES DISTRICT COURT

DATED: September 2, 2022